PETER D. KEISLER
Assistant Attorney General
THEODORE HIRT
Assistant Branch Director
JOEL McELVAIN, D.C. Bar No. 448431
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20001
Telephone:    (202) 514-2988
Fax:          (202) 616-8202
Email:        Joel.L.McElvain@usdoj.gov

Attorneys for Alberto R. Gonzales

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
(SAN JOSE DIVISION)

| | |
|---|---|
| **ALBERTO R. GONZALES, in his official capacity as ATTORNEY GENERAL OF THE UNITED STATES,**<br><br>        **Movant,**<br><br>        v.<br><br>**GOOGLE INC.,**<br><br>        **Respondent.** | Case No. 5:06-mc-80006-JW<br><br>**Second Declaration of Joel McElvain** |

Gonzales v. Google Inc.                                                                    Doc. 23

1.  I am a trial attorney in the Federal Programs Branch of the Civil Division of the United States Department of Justice. I have previously filed a declaration in this action, dated January 18, 2006. The statements in this declaration are based on my personal knowledge.

2.  Attached as Exhibit A are excerpts of a true copy of the transcript of a case management conference held on December 6, 2005, by the Honorable Lowell A. Reed, Jr., in the action *ACLU, et al. v. Gonzales*, Civ. Action No. 98-5591 (E.D. Pa.).

3.  Attached as Exhibit B are excerpts of a true copy of the Form 10-Q that Google Inc. filed with the Securities and Exchange Commission on November 10, 2005. I

1  downloaded this copy on February 24, 2006, from a link on Google's home web page,

2  http://investor.google.com/pdf/20050930_10-Q.pdf.

3      4.  Attached as Exhibit C are true copies of: (1) the web page

4  http://www.google.com/privacypolicy.html and (2) the web page

5  http://www.google.com/privacy_faq.html.  I downloaded these copies on February 24,

6  2006, from links on Google's home web page.

7      In accordance with 28 U.S.C.  1746, I declare and affirm under penalty of perjury

8  that the foregoing is true and correct.

9      Executed at Washington, District of Columbia, this 24th day of February, 2006.

10

11

12

13  JOEL McELVAIN
    *Attorney*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

AMERICAN CIVIL LIBERTIES UNION, )
et al.,                        )
                               )   Case No. CV-98-5591-LR
             Plaintiffs,       )   Philadelphia, PA
                               )
    vs.                        )   December 6, 2005
                               )
ALBERTO R. GONZALES, et al.,   )
                               )
             Defendants.       )

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE LOWELL A. REED, JR.
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:          ADEN J. FINE, ESQUIRE
American Civil Liberties     CHRISTOPHER A. HANSEN, ESQUIRE
Union, et al.                ACLU FOUNDATION
                             125 Broad Street, 18th Floor
                             New York, NY 10004

For the Defendant:          RAPHAEL O. GOMEZ, ESQUIRE
Albert R. Gonzalez, et al.  JAMES D. TODD, JR., ESQUIRE
                             U.S. Department of Justice
                             901 E. Street, N.W.
                             P.O. Box 883
                             Washington, DOC 200044

                             JOEL L. MCELVAIN, ESQUIRE
                             TAMARA ULRICH, ESQUIRE
                             U.S. Department of Justice
                             20 Massachusetts Ave., N.W.
                             Washington, DOC 20530

Audio Operator:

Transcribed by:             DIANA DOMAN TRANSCRIBING
                             P.O. Box 129
                             Gibbsboro, New Jersey  08026-129
                             (856) 435-7172
                             FAX:  (856) 435-7124
                             Email:  Dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

2

1                               I N D E X

2                                    PAGE

3       Case management conference        3

Colloquy                                                11

1    lot -- all this work for only preliminary injunction status,

2    material readily available in this human computer, whatever is

3    left, and I wanted to get some notion of the relevance.

4         Is there any secret about the purpose of -- well, let

5    me do it this way.  Does the plaintiff feel that the defense

6    discovery of the -- these 31, 32 or maybe now 39, whatever the

7    number is, organizations that purport to put out software for

8    screening or filtering or whatever you want to call it, is

9    there any doubt in the plaintiff's mind or any objection from

10   the plaintiff's point of view to the work that's being done as

11   being relevant to the lawsuit?  Probably necessary for both

12   sides to have.

13        MR. HANSEN:  Well, I think, Your Honor, that we have

14   divided the third-party discovery, at least in our own heads,

15   into three categories.  There are a number of companies that

16   are filtering companies that we've all -- we both sought

17   discovery against.  The relevance and obviousness of that is

18   really easy.

19        THE COURT:  Right.

20        MR. HANSEN:  The people who create filtering

21   products.  The second category is internet service providers

22   like AOL.  The relevance of that I think is a little less

23   clear, although most of those companies offer filtering

24   products as part of the package of services that they provide

25   so that if you sign up for AOL, you get a filtering product

1     along with signing up for AOL.  So at least that part of that

2     discovery is clearly relevant as well, obviously relevant to

3     both of us.

4            The third category, the category you've been talking

5     about with the defendants, the search engines, frankly, we're

6     -- we don't object to the defendants doing that discovery, but

7     we don't see the relevance of that discovery.  The -- the

8     notion that --

9            THE COURT:  I wanted to get a feel for -- some of

10    this work that you all are doing is obvious and necessary for

11    the lawsuit.  Maybe you swap responsibilities.  I don't know

12    all that, but I wanted to get a little more tactile feeling for

13    it.  Excuse me for interrupting.

14           MR. HANSEN:  The question, for example, of whether 50

15    people did a search in March of this year for -- under the word

16    sex and what responses they got, we have difficulty seeing the

17    relevance of that discovery, but that's the kind of discovery

18    that the defendants are seeking --

19           THE COURT:  Well --

20           MR. HANSEN:  -- from the search engines.

21           THE COURT:  -- the PI stage, as I recall it, we were

22    using experts to tell us what was going on.  I can think of

23    particularly a plaintiff's witness from Tennessee.  I think the

24    defense sounds like they want to get the facts from the horse's

25    mouth, and excuse the expression, unfiltered, and so that their

Colloquy                                                    13

1   experts can deal with it.

2           MR. GOMEZ:  That's correct, Your Honor.  The -- when

3   a family member or virtually anyone that uses the internet

4   today -- this may be an overstatement, but I -- they use -- and

5   obtains information on the internet, they're using a search

6   engine to gather that information.  So they'll go to --

7   actually, Google is the main player now.  They'll go to a

8   company like Google and then there is a search, and they can

9   search the internet.

10          What Google does is it pulls URL's into a database

11  upon which it uses its software.  So when you or I write, you

12  know, a search for some -- whatever issue it may be, the search

13  engine searches essentially its database and then gives you a

14  list of URL's as where you might have an answer.

15          The -- the universe on the internet, Google and Yahoo

16  and search engines like that actually represent only a portion

17  of the actual universe of the internet.  They're constantly

18  pulling URL's in.  They're also deleting URL's that are -- have

19  gone out of business, no longer exist, because they don't want

20  to send you to a place if it no longer is operating.

21          So they're in a constant flux, but the reality is

22  that if someone in the U.S., a family member or you or I go on

23  the internet, we're most likely going to use a search engine

24  like Google or Yahoo, and the database that they go to is

25  what's really important.

1          THE COURT:  It has to do with typing in a website.

2          MR. GOMEZ:  That's right.

3          THE COURT:  Either remembering or trying to find it.

4          MR. GOMEZ:  Right.  Exactly.  I mean, to -- you know,

5    if you wanted to go to, you know, Quickbook.com, you know, or

6    you did a search for discount hotel websites, you might come up

7    with -- using Google, would come up with maybe a variety of

8    different, Expedia, Quickbook or whatever, and that's what --

9    that's what we're trying to -- actually try to get a database

10   where we could actually work with it and try to do some

11   analyses with that, and that's --

12         THE COURT:  In order to simplify who's doing -- who's

13   using this and what are they doing with it --

14         MR. GOMEZ:  Right.

15         THE COURT:  -- that may be relevant to this case.

16         MR. GOMEZ:  Right.  And I -- obviously, there is a

17   limit to my technical background on this.  So I may be

18   overstating some of how it operates.

19         THE COURT:  I just want to get a concept.

20         MR. GOMEZ:  I'm trying to give an overall picture.

21         THE COURT:  All the smart people that are sitting at

22   that end of the table they have their --

23         MR. GOMEZ:  Yes, Your Honor.

24         THE COURT:  -- own website.  Because it's using a

25   good bit of energy, time, and talent, it occurs to me that I

1    just wonder whether we should be worried about having time to

2    chase these third parties and molly coddle them, if you will,

3    keeping from filing motions and trying to be civil about it,

4    and I can't really tell whether ones that are not finished

5    responding, how important they are, and I'm not going to be

6    able to do that very easily, but I want you to know that I take

7    into account this work as part of getting this material.  I

8    want to assure myself that there is a -- not any formal

9    objection from the other side and partial disinterest in it

10   until they -- until the use of it is sharpened doesn't deter me

11   from accepting the notion that the defense wants to do this,

12   and I can see the -- without predicting evidentiary rulings by

13   any means and the relevance for discovery purposes on either

14   standard which hasn't been declared in this case.

15            And I -- I just wanted to feel like that a little bit

16   and get some appreciation for it.

17            MR. GOMEZ:  Your Honor, if I may address that -- just

18   one point with respect to the third-party discovery and

19   defendant's motion to amend the schedule?  As the plaintiffs

20   had pointed out in their response, there is a difference

21   between both sides essentially for third-party discovery of one

22   month.  We're seeking March 15th as the cutoff date, and the

23   plaintiffs are saying February 15th I believe is the date for

24   third-party discovery cutoff.

25            THE COURT:  I think I can sort that out.

**EXHIBIT B**

| GOOGLE, INC. | RR Donnelley ProFile | gsidoc 8.1 | PAL sugus0dc | 10-Nov-2005 10:55 EST | 53373 TX 1 | 1* |
| FORM 10-Q | | | PAL | | HTM IFV | 0C |
| | | | | | Page 1 of 1 | |

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number: 000-50726**

# Google Inc.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **77-0493581** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

**1600 Amphitheatre Parkway**
**Mountain View, CA 94043**
### (Address of principal executive offices)
### (Zip Code)

**(650) 253-4000**
### (Registrant's telephone number, including area code)

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act)   Yes ☐   No ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)   Yes ☐   No ☒

At October 31, 2005, the number of shares outstanding of Google's Class A common stock was 199,502,630 shares and the number of shares outstanding of Google's Class B common stock was 96,045,503 shares.

| GOOGLE, INC. | RR Donnelley ProFile | g61doc g31 | PAL sugus0dc | 10-Nov-2005 10:55 EST | 53373 TX 3 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-Q | START PAGE | | PAL | | HTM IFV | 0C |

# PART I—FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

### GOOGLE INC.

#### CONDENSED CONSOLIDATED BALANCE SHEETS
#### (in thousands, except par value)

| | As of December 31, 2004 | As of September 30, 2005 |
|---|---|---|
| | | (unaudited) |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $  426,873 | $5,518,569 |
| Marketable securities | 1,705,424 | 2,111,578 |
| Accounts receivable, net of allowance of $3,962 and $7,926 | 311,836 | 541,815 |
| Income taxes receivable | 70,509 | — |
| Deferred income taxes | 19,463 | 18,275 |
| Prepaid revenue share, expenses and other assets | 159,360 | 192,448 |
| Total current assets | 2,693,465 | 8,382,685 |
| Property and equipment, net | 378,916 | 803,078 |
| Goodwill | 122,818 | 171,397 |
| Intangible assets, net | 71,069 | 57,206 |
| Deferred income taxes, non-current | 11,590 | — |
| Prepaid revenue share, expenses and other assets, non-current | 35,493 | 36,635 |
| Total assets | $3,313,351 | $9,451,001 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable | $    32,672 | $    87,346 |
| Accrued compensation and benefits | 82,631 | 117,416 |
| Accrued expenses and other current liabilities | 64,111 | 98,620 |
| Accrued revenue share | 122,544 | 174,712 |
| Deferred revenue | 36,508 | 55,654 |
| Income taxes payable | — | 26,090 |
| Current portion of equipment leases | 1,902 | 10 |
| Total current liabilities | 340,368 | 559,848 |
| Deferred revenue, long-term | 7,443 | 9,968 |
| Liability for stock options exercised early, long-term | 5,982 | 2,908 |
| Deferred income taxes, net | — | 37,051 |
| Other long-term liabilities | 30,502 | 48,158 |
| Stockholders' equity: | | |
| Class A and Class B common stock, $0.001 par value: 9,000,000 shares authorized at December 31, 2004 and September 30, 2005, 266,917, and 290,215 shares issued and outstanding, excluding 7,605 and 4,326 shares subject to repurchase at December 31, 2004 and September 30, 2005 | 267 | 290 |
| Additional paid-in capital | 2,582,352 | 7,234,487 |
| Deferred stock-based compensation | (249,470) | (142,767) |
| Accumulated other comprehensive income | 5,436 | 17,398 |
| Retained earnings | 590,471 | 1,683,660 |
| Total stockholders' equity | 2,929,056 | 8,793,068 |
| Total liabilities and stockholders' equity | $3,313,351 | $9,451,001 |

See accompanying notes.

| GOOGLE, INC. | RR Donnelley ProFile | geldoc 9.1 | PAL sugus0dc | 10-Nov-2005 10:55 EST | | 53373 TX 3 | 1* |
| FORM 10-Q | START PAGE | | PAL | | | HTM IFV | 0C |

Page 2 of 2

3

| GOOGLE, INC. | RR Donnelley ProFile | gal.doc g1 | PAL sugus0dc | 10-Nov-2005 10:55 EST | 53373 TX 4 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-Q | START PAGE | | PAL | | HTM IFV | 0C |

# GOOGLE INC.

## CONDENSED CONSOLIDATED STATEMENTS OF INCOME

### (in thousands, except per share amounts)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| | | (unaudited) | | |
| Revenues | $805,887 | $1,578,456 | $2,157,722 | $4,219,468 |
| Costs and expenses: | | | | |
|    Cost of revenues | 362,099 | 653,826 | 1,003,874 | 1,796,128 |
|    Research and development | 57,409 | 151,721 | 138,190 | 326,906 |
|    Sales and marketing | 65,512 | 104,996 | 170,193 | 284,972 |
|    General and administrative | 40,774 | 92,434 | 87,857 | 221,268 |
|    Stock-based compensation(1) | 67,981 | 46,308 | 219,215 | 142,555 |
|    Non-recurring portion of settlement of disputes with Yahoo | 201,000 | — | 201,000 | — |
| Total costs and expenses | 794,775 | 1,049,285 | 1,820,329 | 2,771,829 |
| Income from operations | 11,112 | 529,171 | 337,393 | 1,447,639 |
| Interest income and other, net | 3,866 | 20,797 | 2,668 | 54,205 |
| Income before income taxes | 14,978 | 549,968 | 340,061 | 1,501,844 |
| Provision (benefit) for income taxes | (37,005) | 168,786 | 145,042 | 408,655 |
| Net income | $ 51,983 | $ 381,182 | $ 195,019 | $1,093,189 |
| Net income per share: | | | | |
|    Basic | $ 0.25 | $ 1.39 | $ 1.14 | $ 4.04 |
|    Diluted | $ 0.19 | $ 1.32 | $ 0.73 | $ 3.80 |
| Number of shares used in per share calculations: | | | | |
|    Basic | 205,007 | 275,130 | 170,511 | 270,655 |
|    Diluted | 274,735 | 289,673 | 268,394 | 287,841 |

(1)  Stock-based compensation is allocated as follows (see Note 1):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2005 | 2004 | 2005 |
| | | (unaudited) | | |
| Cost of revenues | $ 1,996 | $ 1,328 | $ 9,618 | $ 3,925 |
| Research and development | 42,120 | 26,072 | 134,222 | 82,733 |
| Sales and marketing | 11,580 | 6,491 | 39,156 | 20,549 |
| General and administrative | 12,285 | 12,417 | 36,219 | 35,348 |
| | $67,981 | $46,308 | $219,215 | $142,555 |

See accompanying notes.

4



| GOOGLE, INC. | RR Donnelley ProFile | gaidoc gi1 | PAL sugus0dc | 10-Nov-2005 10:55 EST | | 53373 TX 5 | 1* |
| FORM 10-Q | START PAGE | PAL | | | HTM IFV | 0C |

Page 1 of 2

# GOOGLE INC.

## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (in thousands)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2004 | 2005 |
| | (unaudited) | |
| **Operating activities** | | |
| Net income | $ 195,019 | $ 1,093,189 |
| Adjustments: | | |
| Depreciation and amortization of property and equipment | 85,620 | 171,107 |
| Amortization of intangibles and warrants | 10,393 | 27,980 |
| In-process research and development | 950 | 20,812 |
| Stock-based compensation | 219,215 | 142,555 |
| Tax benefits from stock-based award activity | 144,971 | 271,700 |
| Non-recurring portion of settlement of disputes with Yahoo | 201,000 | — |
| Changes in assets and liabilities, net of effects of acquisitions: | | |
| Accounts receivable | (78,361) | (225,083) |
| Income taxes, net | (182,415) | 127,835 |
| Prepaid revenue share, expenses and other assets | (54,134) | (24,645) |
| Accounts payable | 3,369 | 54,694 |
| Accrued expenses and other liabilities | 42,148 | 66,555 |
| Accrued revenue share | 13,301 | 52,577 |
| Deferred revenue | 7,871 | 21,712 |
| Net cash provided by operating activities | 608,947 | 1,800,988 |
| **Investing activities** | | |
| Purchases of property and equipment | (259,915) | (592,386) |
| Purchases of marketable securities | (2,877,309) | (4,992,995) |
| Maturities and sales of marketable securities | 1,548,334 | 4,627,212 |
| Purchases of intangible and other assets | (7,999) | (10,000) |
| Acquisitions, net of cash acquired | (7,833) | (41,748) |
| Net cash used in investing activities | (1,604,722) | (1,009,917) |
| **Financing activities** | | |
| Proceeds from exercise of stock options, net | 10,159 | 33,546 |
| Proceeds from exercise of warrant | 21,944 | — |
| Net proceeds from public offerings | 1,161,446 | 4,287,621 |
| Payment of note receivable from officer/stockholder | 4,300 | — |
| Payments of principal on capital leases and equipment loans | (3,521) | (1,413) |
| Net cash provided by financing activities | 1,194,328 | 4,319,754 |
| Effect of exchange rate changes on cash and cash equivalents | (3,079) | (19,129) |
| Net increase in cash and cash equivalents | 195,474 | 5,091,696 |
| Cash and cash equivalents at beginning of year | 148,995 | 426,873 |
| Cash and cash equivalents at end of period | $ 344,469 | $ 5,518,569 |
| **Supplemental disclosures of cash flow information** | | |
| Cash paid for interest | $ 611 | $ 94 |
| Cash paid for income taxes | $ 181,967 | $ 5,588 |

**Acquisition related activities:**

TGGV=H0H5DP75P0

| GOOGLE, INC. | RR Donnelley ProFile | geidoc 6.1 | PAL sugus0dc | 10-Nov-2005 10:55 EST | | 53373 TX 5 | 1* |
| FORM 10-Q | START PAGE | | PAL | | | HTM IFV | 0C |

Issuance of equity in connection with acquisitions, net of deferred stock-based compensation   $   7,112   $   15,237

See accompanying notes.

| GOOGLE, INC. | RR Donnelley ProFile | psi.doc 8.1.1 | PAL allii0dc | 11-Nov-2005 03:12 EST | 53373 EX31_01 1 | 2* |
|---|---|---|---|---|---|---|
| FORM 10-Q | | | PAL | | HTM ESS | 0C |

Page 1 of 1

**Exhibit 31.01**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER
## PURSUANT TO
## SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Eric Schmidt, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2005

/s/ Eric Schmidt

**Eric Schmidt**
**Chief Executive Officer**

| GOOGLE, INC. | RR Donnelley ProFile | gaidoc 5.1.1 | PAL allii0dc | 11-Nov-2005 03:13 EST | 53373 EX31_02 1 | 2* |
| FORM 10-Q | | | PAL | | HTM ESS | 0C |

Page 1 of 1

**Exhibit 31.02**

## CERTIFICATION OF CHIEF FINANCIAL OFFICER
### PURSUANT TO
### SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, George Reyes, certify that:

1. I have reviewed this quarterly report on Form 10-Q of Google Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2005

/s/ George Reyes

**George Reyes**
**Chief Financial Officer**

**EXHIBIT C**



## Google Privacy Center

Home

About Google

Privacy Highlights

**Privacy Policy**

Privacy FAQ

Terms of Service


More privacy info:
• Desktop
• Gmail
• Groups
• Orkut
• Personalized
Homepage
• Personalized Search
• Store
• Talk
• Toolbar
• Video Player
• Web Accelerator

Find on this site:

[ Search ]

### Google Privacy Policy

October 14, 2005

At Google we recognize that privacy is important. This Policy applies to all of the products, services and websites offered by Google Inc. or its subsidiaries or affiliated companies (collectively, Google's "services"). In addition, where more detailed information is needed to explain our privacy practices, we post separate privacy notices to describe how particular services process personal information, which are accessible from the navigation bar to the left of this notice.

Google adheres to the US safe harbor privacy principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement, and is registered with the U.S. Department of Commerce's safe harbor program.

If you have any questions about this Policy, please feel free to contact us through our website or write to us at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043 USA.

**Information we collect and how we use it:**

We offer a number of services that do not require you to register for an account or provide any personal information to us, such as Google Search. In order to provide our full range of services, we may collect the following types of information:

- **Information you provide** - When you sign up for a Google Account or other Google service or promotion that requires registration, we ask you for personal information (such as your name, email address and an account password). For certain services, such as our advertising programs, we also request credit card or other payment account information which we maintain in encrypted form on secure servers. We may combine the information you submit under your account with information from other Google services or third parties in order to provide you with a better experience and to improve the quality of our services. For certain services, we may give you the opportunity to opt out of combining such information.

- **Google cookies** - When you visit Google, we send one or more cookies - a small file containing a string of characters - to your computer that uniquely identifies your browser. We use cookies to improve the quality of our service by storing user preferences and tracking user trends, such as how people search. Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. However, some Google features and services may not function properly if your cookies are disabled.

- **Log information** - When you use Google services, our servers automatically record information that your browser sends whenever you visit a website. These server logs may include information such as your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

- **User communications** - When you send email or other communication to Google, we may retain those communications in order to process your inquiries, respond to your requests and improve our services.

- **Affiliated sites** - We offer some of our services in connection with other web sites. Personal information that you provide to those sites may be sent to Google in order to deliver the service. We process such information in accordance with this Policy. The affiliated sites may have different privacy practices and we encourage you to read their privacy policies.

- **Links** - Google may present links in a format that enables us to keep track of whether these links have been followed. We use this information to improve the quality of our search technology, customized content and advertising. For more information about links and redirected URLs, please see our FAQs.

- **Other sites** - This Privacy Policy applies to web sites and services that are owned and operated by Google. We do not exercise control over the sites displayed as search results or links from within our various services. These other sites may place their own cookies or other files on your computer, collect data or solicit personal information from you.

Google only processes personal information for the purposes described in the applicable Privacy Policy and/or privacy notice for specific services. In addition to the above, such purposes include:

- Providing our products and services to users, including the display of customized content and advertising;
- Auditing, research and analysis in order to maintain, protect and improve our services;
- Ensuring the technical functioning of our network; and
- Developing new services.

You can find more information about how we process personal information by referring to the privacy notices for particular services.

Google processes personal information on our servers in the United States of America and in other countries. In some cases, we process personal information on a server outside your own country. We may process personal information to provide our own services. In some cases, we may process personal information on behalf of and according to the instructions of a third party, such as our advertising partners.

**Choices for personal information**

When you sign up for a particular service that requires registration, we ask you to provide personal information. If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use.

If we propose to use personal information for any purposes other than those described in this Policy and/or in the specific service notices, we will offer you an effective way to opt out of the use of personal information for those other purposes. We will not collect or use sensitive information for purposes other than those described in this Policy and/or in the specific service notices, unless

we have obtained your prior consent.

You can decline to submit personal information to any of our services, in which case Google may not be able to provide those services to you.

**Information sharing**

Google only shares personal information with other companies or individuals outside of Google in the following limited circumstances:

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.
- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Policy and any other appropriate confidentiality and security measures.
- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against imminent harm to the rights, property or safety of Google, its users or the public as required or permitted by law.

If Google becomes involved in a merger, acquisition, or any form of sale of some or all of its assets, we will provide notice before personal information is transferred and becomes subject to a different privacy policy.

We may share with third parties certain pieces of aggregated, non-personal information, such as the number of users who searched for a particular term, for example, or how many users clicked on a particular advertisement. Such information does not identify you individually.

Please contact us at the address below for any additional questions about the management or use of personal data.

**Information security**

We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data. These include internal reviews of our data collection, storage and processing practices and security measures, as well as physical security measures to guard against unauthorized access to systems where we store personal data.

We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to operate, develop or improve our services. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations.

**Data integrity**

Google processes personal information only for the purposes for which it was collected and in accordance with this Policy or any applicable service-specific

privacy notice. We review our data collection, storage and processing practices to ensure that we only collect, store and process the personal information needed to provide or improve our services. We take reasonable steps to ensure that the personal information we process is accurate, complete, and current, but we depend on our users to update or correct their personal information whenever necessary.

**Accessing and updating personal information**

When you use Google services, we make good faith efforts to provide you with access to your personal information and either to correct this data if it is inaccurate or to delete such data at your request if it is not otherwise required to be retained by law or for legitimate business purposes. We ask individual users to identify themselves and the information requested to be accessed, corrected or removed before processing such requests, and we may decline to process requests that are unreasonably repetitive or systematic, require disproportionate technical effort, jeopardize the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes), or for which access is not otherwise required. In any case where we provide information access and correction, we perform this service free of charge, except if doing so would require a disproportionate effort. Some of our services have different procedures to access, correct or delete users' personal information. We provide the details for these procedures in the specific privacy notices or FAQs for these services.

**Enforcement**

Google regularly reviews its compliance with this Policy. Please feel free to direct any questions or concerns regarding this Policy or Google's treatment of personal information by <u>contacting us</u> through this web site or by writing to us at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043, USA. When we receive formal written complaints at this address, it is Google's policy to contact the complaining user regarding his or her concerns. We will cooperate with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that cannot be resolved between Google and an individual.

**Changes to this policy**

Please note that this Privacy Policy may change from time to time. We will not reduce your rights under this Policy without your explicit consent, and we expect most such changes will be minor. Regardless, we will post any Policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of Policy changes). Each version of this Policy will be identified at the top of the page by its effective date, and we will also keep <u>prior versions of this Privacy Policy</u> in an archive for your review.

If you have any additional questions or concerns about this Policy, please feel free to contact us any time through this web site or at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043, USA.

 

©2005 Google - <u>Home</u> - <u>About Google</u> - <u>Privacy Policy</u> - <u>Terms of Service</u>



# Google Privacy Center

## Google Privacy FAQ

Home

About Google

Privacy Highlights

Privacy Policy

**Privacy FAQ**

Terms of Service


More privacy info:
• Desktop
• Gmail
• Groups
• Orkut
• Personalized
Homepage
• Personalized Search
• Store
• Talk
• Toolbar
• Video Player
• Web Accelerator

*Find on this site:*

[ Search ]

### 1. What is personal information?

"Personal information" is information that you provide to us which personally identifies you, such as your name, email address or billing information, or other data which can be reasonably linked to such information by Google.

### 2. What is a Google Account?

You may access some of our services by signing up for a Google Account and providing us with some personal information (typically your name, email address and a password). This account information will be used to authenticate you when you access Google services and protect your account from unauthorized access by others. We may share personal information among our various services in order to customize content and enhance our services for you. No account information is shared with anyone other than Google except as specified in the Privacy Policy or with your consent.

You can edit or terminate your account at any time through your Google Account settings.

### 3. What is a cookie?

A "cookie" is a small file containing a string of characters that is sent to your computer when you visit a website. When you visit the website again, the cookie allows that site to recognize your browser. Cookies may store user preferences and other information. You can reset your browser to refuse all cookies or to indicate when a cookie is being sent. However, some website features or services may not function properly without cookies.

### 4. What are server logs?

Like most Web sites, our servers automatically record the page requests made when users visit our sites. These "server logs" typically include your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

Here is an example of a typical log entry where the search is for "cars", followed by a breakdown of its parts:

123.45.67.89 - 25/Mar/2003 10:15:32 - http://www.google.com/search?q=cars - Firefox 1.0.7; Windows NT 5.1 - 740674ce2123e969

- 123.45.67.89 is the Internet Protocol address assigned to the user by the user's ISP; depending on the user's service, a different address may be assigned to the user by their service provider each time they connect to the Internet;
- 25/Mar/2003 10:15:32 is the date and time of the query;
- http://www.google.com/search?q=cars is the requested URL, including the search query;

- Firefox 1.0.7; Windows NT 5.1 is the browser and operating system being used; and
- 740674ce2123a969 is the unique cookie ID assigned to this particular computer the first time it visited Google. (Cookies can be deleted by users. If the user has deleted the cookie from the computer since the last time s/he visited Google, then it will be the unique cookie ID assigned to the user the next time s/he visits Google from that particular computer).

**5. What information does Google receive if I click on a link displayed on Google?**

When you click on a link displayed on Google, the fact that you clicked on the link may be sent to Google. In this way, Google is able to record information about how you use our site and services.

We use this information to improve the quality of our services and for other business purposes. For example, Google can use this information to determine how often users are satisfied with the first result of a query and how often they proceed to later results. Similarly, Google can use this information to determine how many times an advertisement is clicked in order to calculate how much the advertiser should be charged.

**6. What is sensitive information?**

"Sensitive personal information" includes information we know to be related to confidential medical information, racial or ethnic origins, political or religious beliefs or sexuality and tied to personal information.

**7. What is aggregated non-personal information?**

"Aggregate non-personal information" is information that is recorded about users and collected into groups so that it no longer reflects or references an individually identifiable user.

**8. URLs and embedded information**

Some of our services, including Google Toolbar and Google Web Accelerator, send the uniform resource locators ("URLs") of web pages that you request to Google. When you use these services, Google will receive and store the URL sent by the web sites you visit, including any personal information inserted into those URLs by the web site operator. Some Google services (such as Google Toolbar) enable you to opt-in or opt-out of sending URLs to Google, while for others (such as Google Web Accelerator) the sending of URLs to Google is intrinsic to the service. When you sign up for any such service, you will be informed clearly that the service sends URLs to Google, and whether and how you can opt-in or opt-out.

For example, when you submit information to a web page (such as a user login ID or registration information), the operator of that web site may "embed" that information - including personal information - into its URL (typically, after a question mark ("?") in the URL). When the URL is transmitted to Google, our servers automatically store the URL, including any personal information that has been embedded after the question mark. Google does not exercise any control over these web sites or whether they embed personal information into URLs.

**9. What protections do I have against intrusions by the government into my use of Google services?**

Google does comply with valid legal process, such as search warrants, court orders, or subpoenas seeking personal information. These same processes apply to all law-abiding companies. As has always been the case, the primary protections you have against intrusions by the government are the laws that apply to where you live.

If you have any additional questions or concerns about this Policy, please feel free to <u>contact us</u> any time through this web site or at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043, USA.

 

©2005 Google - <u>Home</u> - <u>About Google</u> - <u>Privacy Policy</u> - **<u>Terms of Service</u>**

CERTIFICATE OF SERVICE

I hereby certify that I have made service of the foregoing Second Declaration of Joel McElvain by depositing in Federal Express at Washington, D.C., on February 24, 2006, true, exact copies thereof, enclosed in an envelope with postage thereon prepaid, addressed to:

Albert Gidari, Jr., Esquire
Perkins Coie, LLP
1201 Third Avenue
Seattle, Washington 98101-3099
(Counsel for Respondent Google Inc.)

Lisa Delehunt, Esquire
Perkins Coie, LLP
180 Townsend Street, Third Floor
San Francisco, CA 94107
(Counsel for Respondent Google Inc.)

Aden J. Fine, Esquire
American Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
(Counsel for Plaintiffs, *ACLU v. Gonzalez*, E.D. Pa. No. 98-cv-5591)

JOEL McELVAIN
*Attorney*